*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

## UNITED STATES
Appellee

**v.**

## Timothy B. HENNIS, Master Sergeant
United States Army, Appellant

### No. 17-0263
Crim. App. No. 20100304

Argued October 22, 2019—Decided February 28, 2020

Military Judge: Patrick J. Parrish

For Appellant: *Major Timothy G. Burroughs* and *Jonathan F. Potter,* Esq. (argued); *Lieutenant Colonel Christopher Daniel Carrier* (on brief).

For Appellee: *Major Catherine M. Parnell* (argued); *Colonel Steven P. Haight, Lieutenant Colonel Eric K. Stafford,* and *Captain Allison L. Rowley* (on brief).

Chief Judge STUCKY delivered the opinion of the Court, in which Judges RYAN, OHLSON, SPARKS, and MAGGS, joined.

————————

Chief Judge STUCKY delivered the opinion of the Court.

This capital murder case is before us for mandatory review under Article 67(a)(1), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 867(a)(1) (2012). After reviewing the assigned and personally asserted errors, we affirm the judgment of the United States Army Court of Criminal Appeals (CCA).

## I. Background

Captain GE, United States Air Force, his wife KE, and their three daughters lived in Fayetteville, North Carolina. In anticipation of their upcoming assignment to England, the family put an advertisement in the local Fort Bragg newspaper to find a new home for their dog. On May 10, 1985, while Captain GE was on temporary duty to Maxwell Air Force Base, Alabama, Appellant visited the family's home to meet the dog.

On May 12, 1985, KE's neighbors telephoned the sheriff because they had not seen KE or her daughters for several days, newspapers were piling up in the front yard, and they could hear crying from inside the house. Inside, the responding officer found the bodies of KE and two of her three daughters, aged five and three. The youngest daughter was found alive in her crib. KE's jeans were discovered on the floor alongside underwear that had been cut from her body. Her wrists bore ligature marks. An autopsy determined that KE and her two daughters died of multiple stab wounds "and a large cut in the neck of each." *State v. Hennis*, 372 S.E.2d 523, 525 (N.C. 1988). Intact spermatozoa were discovered in KE's vagina.

In July 1986, a North Carolina jury sentenced Appellant to death for the three murders. *Id.* at 528; *Hennis v. Hemlick*, 666 F.3d 270, 271 (4th Cir. 2012). Due to the admission of especially "gruesome" photographs of the bodies of the victims after Appellant had stipulated to the cause of death as stabbing, as well as the manner in which the photographs were displayed above Appellant's head during trial, the North Carolina Supreme Court ordered a new trial. *Hennis*, 372 S.E.2d at 528. Appellant was acquitted at the new trial in 1989. *Hennis*, 75 M.J. at 802. Appellant returned to active duty status and retired from the regular Army in 2004 as a Master Sergeant. *Id.*

In 2006, following advances in deoxyribonucleic acid (DNA) analysis, forensic examiners established "the near-statistical certainty" that the spermatozoa found in KE's vagina were Appellant's. *Id.* at 802–03. In light of this new evidence, the Army recalled Appellant to active duty. *Id.* at 803.

In 2010, a general court-martial with enlisted members convicted Appellant of three specifications of premeditated murder. Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918 (1982). The court members sentenced him to a dishonorable discharge, forfeiture of all pay and allowances, reduction to the grade of E-1, and to be put to death. The convening authority approved the sentence. The CCA affirmed the approved findings and sentence. *Hennis*, 75 M.J. at 856.

Appellant's counsel have assigned forty issues and Appellant has personally asserted three additional issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). After careful review of each of these issues, we agree with the CCA's reasoning and conclude that none addressed by that court have merit. Similarly, none of the issues raised for the first time in this Court have merit. We will discuss herein only the five issues on which we granted oral argument.

## II. Jurisdiction

Appellant challenges the jurisdiction of the court-martial in several ways. Jurisdiction is the power of a court "to decide a case or issue a decree." *Black's Law Dictionary* 980 (10th ed. 2014). When challenged at trial, the prosecution "must prove jurisdiction by a preponderance of evidence."[1] *United States v. Morita*, 74 M.J. 116, 121 (C.A.A.F. 2015). We review such questions de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F.), *cert. denied*, 139 S. Ct. 2682 (2019).

---

[1] After the military judge denied Appellant's pretrial challenge to the jurisdiction of the court-martial, Appellant filed writs of mandamus, habeas corpus, and prohibition with the CCA, which were denied. *See Hennis v. Hemlick*, No. 5:09-HC-2169-BO, 2010 U.S. Dist. LEXIS 146565, at *4, 2010 WL 11508257, at *2 (E.D.N.C. Mar. 16, 2010), *aff'd*, 666 F.3d 270, 273–74 (4th Cir.), *cert. denied*, 566 U.S. 1004 (2012). A writ appeal before this Court was also denied. *Hennis v. Parrish*, 67 M.J. 50 (C.A.A.F. 2008). Thereafter, Appellant filed a petition for writ of habeas corpus in the United States District Court of North Carolina, arguing the court-martial lacked jurisdiction over him. The district court dismissed the petition on grounds of abstention: "where members of the armed forces file habeas petitions seeking relief from the military restraint of liberty, federal civil courts should not entertain petitions until all available remedies within the military court system have been exhausted." *Hennis*, 2010 U.S. Dist. LEXIS 146565, at *7–15, 2010 WL 11508257, at *3–5 (citing *Schlesinger v. Councilman*, 420 U.S. 738 (1975)). Appellant filed two original habeas corpus petitions in this Court, which were both denied without prejudice. *Hennis v. Nelson*, 74 M.J. 77 (C.A.A.F. 2014); *Hennis v. Ledwith*, 73 M.J. 240 (C.A.A.F. 2014). Once convicted, Appellant filed a pro se petition for writ of habeas corpus with the United States District Court for the District of Kansas, which was dismissed without prejudice for failure to exhaust military court remedies. *Hennis v. Nelson*, No. 15-3008-KHV, 2015 U.S. Dist. LEXIS 127734, at *1, 2015 WL 5604271, at *1 (D. Kan. Sept. 23, 2015).

A. Issue I: Break in Service

Before entry of pleas, Appellant challenged the jurisdiction of a court-martial to try him for the charged offenses, arguing that there was a break in his service that divested the Army of jurisdiction over the offenses. The military judge denied Appellant's motion in April 2008. Appellant now asserts that the "Army relinquished any ability to court-martial [him] for conduct in 1985 when it discharged him on June 12, 1989."

Appellant initially enlisted in the Regular Army on January 29, 1981, for four years, but he extended his service obligation on February 1, 1984, for one year, to attend warrant officer training and flight school. 75 M.J. at 806. His new expiration of term of service (ETS) was January 28, 1986.

North Carolina authorities arrested appellant on May 16, 1985, for murder and rape. He was released on bail on December 15, 1985. Although there is no corresponding paperwork, it appears the Army granted Appellant a seven-month extension to compensate for the seven months he spent in state pretrial confinement before he was released on bail. *See Hennis*, 75 M.J. at 807. If so, that would have extended Appellant's ETS to August 27, 1986.

Appellant was convicted by the state court on July 4, 1986.[2] The Supreme Court of North Carolina set aside the convictions but authorized a new trial, at which Appellant was acquitted on April 19, 1989. Two days later, Appellant reported for duty at Fort Knox, Kentucky, where he had been assigned after his first civilian trial. 75 M.J. at 806.

As Appellant's civilian conviction never became final, the federal statute in effect at the time characterized the periods Appellant served in pretrial and post-trial confinement as creditable service—they would have counted as time served against his term of enlistment. *See* 10 U.S.C. § 972(3), (4)

---

[2] As a result, an administrative discharge board recommended that Appellant be discharged from the Army under other than honorable conditions. The discharge was approved on October 3, 1986, but execution was deferred pending the outcome of his appeal of his criminal convictions. The general court-martial convening authority eventually voided the discharge after the reversal, retrial, and acquittal in the state courts.

(1988). On May 22, 1989, Appellant's commanding general, acting under Dep't of the Army, Reg. 630-10, Personnel Absences, Absence Without Leave and Desertion ¶ 1-8 (update 13, dated Mar. 16, 1988) [hereinafter AR 630-10], no doubt to effectuate § 972, ordered Appellant's absence from duty from May 16, to December 15, 1985, (initial arrest to bail) and from July 4, 1986, to April 19, 1989 (period of post-trial incarceration), reclassified as "unavoidable." *Hennis*, 75 M.J. at 806.

Any period of unauthorized absence excused as unavoidable is "creditable for all purposes." *Id.* at 806–07 (citing AR 630-10 ¶ 1-8(c)). By this order, the commanding general reestablished Appellant's ETS as no later than August 27, 1986. Nevertheless, both the Army and Appellant acted as if his enlistment had not terminated. He made no attempt to separate and made no objection to his continued service.

On June 1, 1989, Appellant submitted a Department of the Army Form 3340-R, asking to reenlist for four years. Block 2c listed June 17, 1989, as his ETS. Block 2d noted that Appellant had two extensions on his original enlistment. The first, effective February 1, 1984, for twelve additional months, corresponds with a document signed by Appellant to extend his ETS to attend warrant officer training and flight school. *Hennis*, 75 M.J. at 807. The second extension appears to be for the time he served in pretrial confinement before his first civilian trial, but there is no documentation to support that conclusion.

On June 12, 1989, five days before the ETS date stated on his reenlistment Form 3340-R, Appellant was honorably discharged from the Army. On the following day, Appellant reenlisted for four years, using a Department of Defense Form 4, Enlisted/Reenlistment Document, Armed Forces of the United States, bearing the typed words, "Immediate Reenlistment" in the top margin. *Hennis*, 75 M.J. at 807. Appellant remained on active duty until his retirement on July 31, 2004. *Id.* Charges were preferred against Appellant on November 9, 2006.

Before entry of pleas, Appellant moved to dismiss for lack of jurisdiction. He argued that a break in service between his acquittal in civilian court and his subsequent enlistment deprived the court-martial of subject-matter jurisdiction. The

military judge concluded there was no break in service; that Appellant's discharge was for the sole purpose of reenlistment; and there was no intent to sever Appellant's relationship with the Army, as the discharge was a necessary predicate for him to reenlist. Even assuming a break in service, the military judge concluded that the Army still had jurisdiction under Article 3(a), UCMJ, 10 U.S.C. § 803(a).

The CCA determined that, once the commanding general found Appellant's incarceration "unavoidable," his ETS reverted to August 27, 1986. As Appellant's discharge "occurred *after* his contractual service obligation expired," his "military status terminated—albeit briefly—immediately before his reenlistment." *Hennis*, 75 M.J. at 808 (citing *United States v. Clardy*, 13 M.J. 308 (C.M.A. 1982)). Despite this break in service, the CCA held that the court-martial had jurisdiction under Article 3(a), UCMJ, 10 U.S.C. § 803(a) (1982). *Id.* at 810.

Article 3(a), as enacted in 1950 and in effect at the time of the alleged offenses, provided:

> Subject to the provisions of article 43 [the statute of limitations], any person charged with having committed, while in a status in which he was subject to this code, an offense against this code, punishable by confinement for five years or more and for which the person cannot be tried in the courts of the United States or any State or Territory thereof or of the District of Columbia, shall not be relieved from amenability to trial by court-martial by reason of the termination of said status.[3]

---

[3] Originally Act of May 5, 1950, ch. 169, Pub. L. No. 81-506, 64 Stat. 109 (codified at 50 U.S.C. § 553(a) and repealed in 1956), then Act of Aug. 10, 1956, ch. 1041, Pub. L. No. 84-1028, 70A Stat. 38 (codified at 10 U.S.C. § 803(a)). Article 3(a) was rewritten in 1992. National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102–484, §§ 1063, 1067, 102 Stat. 2315, 2505, 2506 (1992). Currently, "if a person is subject to military jurisdiction at the time of the trial and was subject to military jurisdiction at the time of the offense, that person may be tried for offenses occurring during a prior period of military service." *Willenbring v. Neurauter*, 48 M.J. 152, 158 (C.A.A.F. 1998), *overruled on other grounds by United States v. Mangahas*, 77 M.J. 220 (C.A.A.F. 2018). The new "statute was given prospective effect, applying only to offenses occurring on or after October 23, 1992." *Id.*

Early in the UCMJ's history, the Supreme Court limited application of Article 3(a) court-martial jurisdiction "to persons who are actually members or part of the armed forces." *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 15 (1955) (holding Article 3(a) was unconstitutional as applied to a man accused of committing murder in Korea while he was on active duty, given that he had been discharged from the service and returned to civilian life). "It has never been intimated by this Court, however, that Article I military jurisdiction could be extended to civilian ex-soldiers who had severed all relationship with the military and its institutions." *Id.* at 14.

This jurisdiction question arose again in *Clardy*, 13 M.J. 308. There, the CCA's predecessor, the United States Army Court of Military Review, concluded that the accused's offenses, which had been committed shortly before he had been discharged for the purpose of immediate reenlistment, "were not in the category of offenses as to which military jurisdiction was preserved by Article 3(a)." *Id.* at 309. The government appealed. The Court of Military Appeals (C.M.A.) concluded that a servicemember gives "implied consent … to continuation of his military status when he receives an early discharge and immediately reenlists" and that "may be viewed as including his consent that he remain amenable to prosecution for offenses in the prior enlistment." *Id.* at 315. In essence, the Court established a two-part test:

(1) Was there a break in service between the offense and the preferral of charges? If the accused was discharged on the last day of his term of service and enlisted the following day, there was a break in service. If the accused was discharged before his ETS for the sole purpose of reenlistment and reenlisted before his ETS, there was no break in service and the court-martial had jurisdiction. *Id.* at 311, 314.

(2) If there was a break in service, the accused is still subject to court-martial jurisdiction if, consistent with Article 3(a), UCMJ:

    (a) The accused was subject to the UCMJ both at the time of the offense and at the time of preferral of charges;

    (b) The offense is punishable by confinement for five or more years; and

7

(c) The accused "cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia." Article 3(a), UCMJ.

*Id.* at 314–15.

The Government has not contested the CCA's holding that there was a break in service.[4] Therefore, we will discuss only the second prong of the *Clardy* test. Appellant was on active duty at the time of the offenses and at the time the charges were preferred, and the charged offenses are punishable by confinement for more than five years. Therefore, the remaining issue is whether "the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia." Article 3(a), UCMJ.

At trial, Appellant argued that he could have been tried by a state and, indeed, was tried by the State of North Carolina twice. The military judge rejected Appellant's argument. 75 M.J. at 809. The CCA agreed with the military judge. It interpreted the plain language of the statute and determined that the Double Jeopardy Clause barred the state from prosecuting and, therefore, no other entity except the military could try him. *Id.*

Crucial to resolution of this issue is the instant at which we are to apply Article 3(a). If we apply it at the time the offenses were committed, Appellant clearly could have been tried by another jurisdiction. Thus, Article 3(a) would not have preserved court-martial jurisdiction. On the other hand, if we apply Article 3(a) at the time court-martial charges were preferred, no other court had jurisdiction to try Appellant for these offenses, and Article 3(a) would have preserved jurisdiction.

Based on the plain language of the statute, we reject Appellant's interpretation of Article 3(a). The issue is not whether another jurisdiction could have ever tried Appellant, but rather whether there was any court that could try him at the time charges were preferred. At the time of preferral of

---

[4] The Government merely argues that, "[a]ssuming arguendo there was a break in Appellant's service, this Court should find that there was jurisdiction over Appellant pursuant to Article 3(a), UCMJ."

charges, Appellant "[could not] be tried in the courts of the United States or any State" because, at that time, double jeopardy barred North Carolina from prosecuting and no federal statute under Title 18, triable in a U.S. district court, covered Appellant's conduct. As no other jurisdiction could have tried Appellant at the time charges were preferred, the prosecution met its burden of establishing jurisdiction by a preponderance of evidence.

This analysis is consistent with our decision in *Willenbring*. There, the offenses were alleged to have been committed "at Fort Belvoir, Virginia, an area of exclusive federal jurisdiction." 48 M.J. at 176. The accused would have been subject to trial in federal district court, except that the federal statute of limitations had run. We held that, by establishing that the federal statute of limitations had run, the prosecution had met its burden of showing that Willenbring " 'cannot be tried in the courts of the United States' for the purposes of Article 3(a)." *Id.* at 177 (quoting Article 3(a)). Thus, this Court implicitly rejected the notion that Article 3(a) becomes operative at the time the offenses were committed. We now make this interpretation explicit.

*Willenbring* forecloses Appellant's argument that, if he had waived his double jeopardy protection the State of North Carolina could have tried him at the time charges were preferred. In *Willenbring*, we held that the fact the appellant could waive his statute of limitations defense did not mean that the federal civilian authorities could try him, because the statute of limitations, although waivable, is "a limitation on the power of a prosecutor to bring charges and on the power of a court to try a case." 48 M.J. at 176. Similarly, the Supreme Court has held that the protection against double jeopardy, though waivable, "serves principally as a restraint on courts and prosecutors." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Therefore, the State of North Carolina could not have brought a "knowing and intentional" prosecution in good faith against Appellant at the time charges were preferred against him. *Willenbring*, 48 M.J. at 177.

## B. Issue II: Subject Matter Jurisdiction

Citing *O'Callahan v. Parker*, Appellant argues, "[m]ilitary courts should only try offenses arising from military service."

395 U.S. 258 (1969), *overruled by Solorio v. United States*, 483 U.S. 435 (1987), He insists that his case did not arise in the land or naval forces and, therefore, he had a Fifth Amendment right to indictment by grand jury and trial before a civilian court. Appellant recognizes that *Solorio* overruled *O'Callahan*. Nevertheless, he asserts that capital cases are different and that this is the first capital case since *Solorio* was decided in which there is no service connection.

"Congress shall have the Power … To make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. The Fifth Amendment to the Constitution provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger ….

U.S. Const. amend. V.

In *O'Callahan*, the Supreme Court determined that for a case to arise in the land or naval forces under the Fifth Amendment there must be a connection between the offense itself and the military. 395 U.S. at 272–73, The Court held that O'Callahan's status as a military member, without more, was not sufficient to establish subject matter jurisdiction. " 'Status' is necessary for jurisdiction; but it does not follow that ascertainment of 'status' completes the inquiry, regardless of the nature, time, and place of the offense." *Id.* at 267. After the military struggled to define the term "service connection," the Supreme Court set forth twelve factors for courts to consider in determining whether a service connection existed. *See Relford v. Commandant*, 401 U.S. 355, 365 (1971).

*O'Callahan* and its progeny lasted less than twenty years. In 1987, the Supreme Court concluded that Article I, § 8, cl. 14, granted Congress "primary responsibility for the delicate task of balancing the rights of servicemen against the needs of the military," and the exercise of that responsibility is entitled to judicial deference. *Solorio*, 483 U.S. at 447–48. The Court then returned to the pre-*O'Callahan* view of court-martial jurisdiction. "The test for jurisdiction ... is one of *status*,

namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term land and naval Forces." *Id.* at 439 (alteration in original) (internal quotation marks omitted) (citations omitted).

Appellant recognizes that *Solorio* dispensed with the *O'Callahan* service-connection test. Citing Justice Stevens's concurring opinion in *Loving v. United States*, 517 U.S. 748, 774 (1996) (Stevens, J., joined by Souter, J., Ginsburg, J., and Breyer, J., concurring), however, he argues that "whether a 'service connection' requirement should obtain in capital cases" is an open question because *Solorio* was not a capital case and because the historical data cited in that case suggest military jurisdiction over capital cases is not as strong as for noncapital offenses.

Justice Stevens's suggestion in *Loving* that *Solorio* may not apply to capital cases is unfounded. The Fifth Amendment's exclusion of "cases arising in the land or naval Forces" from its ambit makes no distinction between the treatment of capital cases and that of infamous crimes. Although *Solorio* itself was an "infamous crime" case, the Supreme Court did not qualify its conclusion that "military jurisdiction has always been based on the status of the accused, rather than on the nature of the offense." 483 U.S. at 439 (internal quotation marks omitted) (citation omitted). In fact, the majority cited military capital cases in support of its position. *Id.* at 449 n.14. We hold that *Solorio* applies to capital cases.

Based on his belief that he established the necessity for a service-connection requirement, Appellant argues that this case lacks any meaningful connection to military service and, therefore, does not arise in the land or naval forces: "The only thread the government can trace to military service is MSG Hennis's 1985 status as an Army sergeant, and the fact that [the victims] were family members of an Air Force officer." He asserts, "[t]his Court has never found such incidental circumstances sufficient to render *an offense* 'service-connected.' " This Court may not have in its present incarnation, but the C.M.A. did exactly that.

In *United States v. Solorio*, the C.M.A. held that the appellant's off-base sexual abuse of the dependents of Coast Guardsmen was service connected. 21 M.J. 251, 255–56

(1986). It relied on the trauma to the parents, which diminished their ability to perform their duties, and the limitations on the appellant's future assignments because of "the tensions that his presence would create in an organization." *Id.* at 256. Moreover, Justice Stevens, upon whom Appellant's argument relies, would have found Solorio's offenses service-connected. *Solorio*, 483 U.S. at 451 (Stevens, J., concurring in the judgment). We have no doubt Justice Stevens would have reached the same conclusion in this case, where Appellant slaughtered the wife and two children of a military member.

## C. Issue III: Personal Jurisdiction

Appellant asserts that he did not have a military status such that he was subject to court-martial jurisdiction at the time of his trial. He contends: (1) the Army lacked authority to recall him to active duty; and (2) the Army foreclosed personal jurisdiction based on his retired status when, over his objection, it treated him as a soldier on active duty.

When he became eligible to retire, Appellant was released from active duty, placed on the retired list, and transferred to the U.S. Army Reserve Control Group (Retired), U.S. Army Reserve Personnel Center, St. Louis, Missouri, effective July 31, 2004. After the DNA testing established it was Appellant's spermatozoa found in KE's vagina, the convening authority asked the Assistant Secretary of the Army (Manpower and Reserve Affairs (ASA (M&RA)) to order Appellant to active duty "to facilitate courts-martial action." The Acting ASA (M&RA) ordered Appellant to active duty under the provisions of Article 2(a)(4), UCMJ, 10 U.S.C. § 802(a)(4), 10 U.S.C. § 688, and Dep't of the Army, Reg. 27-10, Legal Services: Military Justice ¶ 5-2(b)(3) [hereinafter AR 27-10] (Secretary's authorization to recall retired members for purposes of court-martial proceedings). Once Appellant was properly recalled to active duty, he was subject to the UCMJ "from the date[] when [he was] required by the terms of the call or order to obey it." Article 2(a)(1), UCMJ.

To effectuate that order, the Army's Human Resources Command ordered Appellant to active duty on September 14, 2006, directing him to report to XVIII Airborne Corps in October 2006, for the purpose of "UCMJ processing." Appellant

complied. He was arraigned on February 4, 2008, convicted on April 8, 2010, and sentenced on April 15, 2010.

1.

Appellant accepts that the Army could have tried him as a retiree but disputes that the Army had the ability to recall him to active duty. Appellant contends that, as he was assigned to a reserve unit, he was both a retiree and a reservist. He argues that a reservist cannot be recalled to active duty for any offense committed before 1987.

But Appellant was not a reservist, nor was he recalled from reserve status. He was recalled to active duty as a retired member of the Regular Army under regulations prescribed by the Secretary of Defense. *See* 10 U.S.C. § 688(a), (b)(1) (2000); Dep't of Defense Dir. 1352.1, Management and Mobilization of Regular and Reserve Retired Military Members ¶ 4.1. (July 16, 2005); AR 27-10 ¶ 5-2(b)(3). The fact that Appellant was attached to a reserve organization for accounting purposes did not make him a reservist.

Appellant contends that even if he were a retiree, rather than a reservist, the Army could recall him to active duty only in the "'interest of national defense,'" not for UCMJ processing. At the time of Appellant's recall to active duty, the service secretary could assign the recalled member to "such duties as the Secretary considers necessary in the interests of national defense." § 688(c). Although the term "interests of national defense" is undefined, we have no doubt that it includes recalling a retiree to face court-martial charges of killing three military dependents. *Cf. Pearson v. Bloss*, 28 M.J. 376, 380 (C.M.A. 1989) (denying writ appeal of retired accused who argued that he was not subject to court-martial jurisdiction).

2.

Appellant's claim that the Army lost jurisdiction over him by recalling him to active duty from retired status is without merit. The Army had personal jurisdiction over Appellant because of his retired status. Article 2(a)(4), UCMJ. The Army was also statutorily authorized to and did recall him to active duty under regulations prescribed by the Secretary of De-

fense. Appellant was subject to court-martial jurisdiction under either status and the Army did not lose personal jurisdiction over him by choosing to recall him. *See United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018).

### III. Issue VI: Opportunity to Present a Defense

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks omitted) (citation omitted); *accord United States v. Woolheater*, 40 M.J. 170, 173 (C.M.A. 1994) (recognizing an accused's constitutional right to "present legally and logically relevant evidence that someone else had the motive, knowledge, and opportunity to commit the" offense). Article 46, UCMJ, grants an accused equal opportunity with the trial counsel "to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." 10 U.S.C. § 846 (2006).

### A. Witnesses

Appellant asserts that someone else could have committed the offenses and that the state's investigation was deeply flawed. He complains that the military judge denied him a meaningful opportunity to present a defense by refusing to permit him to call three witnesses: (1) WHH, the victims' neighbor, whom Appellant claims had scratches on his face around the time of the murders, fit the description of a man who was observed leaving the victim's residence, and refused to provide hair, fingerprint, and handwriting samples;[5] (2) Mary Krings, who worked with and dated WHH, who would testify that he had scratches on his face around the time of the murders, made inconsistent statements about those scratches, and asked his employer for a transfer to a different city; and (3) Gary Staley, WHH's roommate, who would testify that he owned a light-colored van, like the one seen parked near the victims' home on the night of the mur-

---

[5] Appellant argues that the handwriting samples may have helped determine whether WHH sent letters to the North Carolina county prosecutors after Appellant's first trial, signed by a "Mr. X," which said that he, not Appellant, had killed the victims.

ders, and WHH had access to it. The CCA held that the military judge did not abuse his discretion in concluding that Appellant failed to fulfill his burden to establish the relevance and necessity of the witnesses' testimony. *Hennis*, 75 M.J. at 820–25.

In discussing the relevance of Mr. Staley's testimony, the military judge concluded:

> While the defense theory is that [WHH] is a suspect in the … murders, the defense proffered no evidence to support that theory or that [WHH] in any way resembles the person seen near the [victims'] residence at the time of the murders. The DNA sample provided by [WHH] excludes him as the donor of the semen found at the crime scene. The defense has made no proffer that the DNA testing is inaccurate. Since there is no evidence connecting Mr. [WHH] to the crime scene, the relevance of the color of [Mr. Staley's] van is not the least bit clear.

In *Holmes*, the accused was convicted of murder, criminal sexual conduct, burglary, and robbery. 547 U.S. at 322. His palm print was found on the interior knob of the front door; fibers matching his black sweatshirt were found on the victim's bed sheets; fibers matching his blue jeans were found on the victim's pink nightgown; the eighty-six-year-old victim's underwear contained a mixture of DNA from two individuals, which excluded 99.99% of the population other than the accused and the victim; and the accused's tank top contained a mixture of the accused's blood and the victim's blood. *Id.*

The judge in *Holmes* refused the defense request to call several witnesses who placed Jimmy White in the victim's neighborhood on the morning of the assault and four witnesses who would testify that White acknowledged that the accused was innocent or admitted that he had committed the crimes. *Id.* at 323. The trial judge excluded the evidence based on a state supreme court case, which held that such evidence was admissible if it raised "a reasonable inference or presumption" that the accused was innocent but not "if it merely cast[] a bare suspicion upon another" or raised "a conjectural inference as to the commission of the crime by another." *Id.* at 323–24 (alteration in original) (internal quotation marks omitted) (citation omitted).

The Supreme Court noted "that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *Id.* at 331. It held that a judge is not permitted to exclude *probative* evidence that a third party committed the offense solely because there is strong forensic evidence of an accused's guilt. *Id.* at 329. Also:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Id.* at 326; *see United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011).

We review the military judge's ruling on the production of witnesses for an abuse of discretion. "We will not set aside a judicial denial of a witness request unless [we have] a definite and firm conviction that the [trial court] committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. McElhaney*, 54 M.J. 120, 126 (C.A.A.F. 2000) (alterations in original) (internal quotation marks omitted) (citation omitted).

It is clear the military judge understood his duty to evaluate the defense evidence for its relevance to the case. And unlike in *Holmes*, there is simply no probative evidence that WHH might have committed the offenses, just Appellant's speculation. *See United States v. Lighty*, 616 F.3d 321, 358–59 (4th Cir. 2010). Specifically, WHH was excluded as a source of the semen found in KE's vagina, Appellant was unable to establish when or how WHH sustained cuts to his face; and there was a considerable size disparity between WHH and Appellant, who had been identified by a passerby as having departed KE's home at 3:00 a.m. on the date of the killings. As the military judge ruled, the defense did not proffer any evidence to support its theory that WHH resembled the person seen near the locus in quo at the time

of the murders. We are not convinced that the military judge committed a clear error of judgment in weighing the factors of relevance and necessity. Therefore, the military judge did not abuse his discretion in refusing to permit the testimony of the three witnesses.

## B. Expert Assistance

Appellant asserts that he was inappropriately denied the assistance "of a forensic serologist, Dr. William Blake, and a crime scene analyst, Mr. Larry Renner, to review the totality of physical evidence, determine what items could reveal the presence of a third party at the crime scene, and then test those items accordingly." He acknowledges that the convening authority funded Dr. Blake "to retest four items already tested by government: the vaginal swabs and smears, the fingernail clippings from [KE]."

The convening authority approved funding for Dr. Blake first in April 2007 and again in December 2008. The Government canceled the contract in March 17, 2009, because it appeared that the defense was not using Dr. Blake's services—the defense had not provided the Government a request to release any items for testing.

A week later, the defense again requested funding for Dr. Blake to test 39 of the 154 items seized at the crime scene. The convening authority approved the funding but only for the vaginal smears, vaginal swabs, and fingernail clippings taken from KE. Appellant moved the court to order funding to test the remaining thirty-five items from their original request. The court granted the request, in part, by ordering the appointment of Dr. Blake as an expert consultant and that the prosecution provide him with the vaginal smears and swabs, fingernail clippings, and hand fibers, sixty-four latent lifts, eight photocopies of the Mr. X's letters, and the original Mr. X letters and envelopes. The military judge denied the request for the other items, as their lack of connection to Appellant already exculpated him.

On September 9, 2009, Appellant asked the court to grant additional funding because Dr. Blake had been unable to complete the testing and consultation previously ordered. The motion was granted the next day.

On September 25, 2009, the defense asked for an additional $20,000 for Dr. Blake to test other evidentiary items as they might yield evidence of a third-party actor. The prosecution conceded that testing of the hair, fibers, blood, and fingerprints excluded Appellant as their source, and that the only forensic evidence linking Appellant to the crime scene was the DNA analysis of KE's vaginal swabs. The military judge denied the motion. It was impossible to determine when the evidence that the defense wanted tested might have been left in the house KE and her family had rented. The military judge concluded that the previously tested DNA samples, which excluded Appellant as the contributor, could be used by the defense at trial. He also determined that certain non-tested samples did not inculpate Appellant. Accordingly, the military judge ruled that Appellant could introduce the former category of samples into evidence and the trial counsel could not argue that the latter category "incriminate[d] the accused" because this evidence was necessarily exculpatory for the accused without further testing.

To be entitled to expert assistance, an:

> accused has the burden of establishing that a *reasonable probability* exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial. In order to satisfy the first prong of this test, [t]he defense must show (1) why the expert is necessary; (2) what the expert would accomplish for the accused; and (3) why defense counsel is unable to gather and present the evidence that the expert would be able to develop.

*United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (emphasis added) (internal quotation marks omitted) (citations omitted).

This Court reviews the military judge's ruling on requests for expert assistance for an abuse of discretion. *Id.; see United States v. Akbar*, 74 M.J. 364, 400 (C.A.A.F. 2015). The trial court abuses its discretion if its ruling is "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Lloyd*, 69 M.J. at 99 (internal quotation marks omitted) (citations omitted).

Appellant wanted to explore the possibility that evidence the prosecution found to be without inculpatory value might

exonerate him by pointing to someone else as the perpetrator. He only asserted, however, that additional forensic testing *might* result in a DNA profile that could *potentially* identify other persons who, at any time in the past, had been in the home Captain GE and his family were renting. The military judge found that Appellant had not proffered that the test results would indicate when the evidence he wanted tested had been left in the home. As the military judge ruled, the mere possibility that the expert would be of assistance is not sufficient. Appellant must demonstrate a reasonable probability. He failed to do so. Furthermore, the military judge specifically authorized Appellant to introduce items found in the home that the prosecution had determined through testing were not inculpatory, and to argue that this evidence suggested someone other than Appellant committed the offenses. This supports a conclusion that the expert was not necessary, and the denial of expert assistance did not result in a fundamentally unfair trial. Thus, the military judge did not abuse his discretion in denying the request.

### IV. Issue XI. Voir Dire and Challenges

Appellant alleges that the military judge unfairly restricted voir dire and "displayed considerable parsimony" in granting defense challenges for cause. We disagree. The military judge analyzed each challenge exhaustively and granted twenty-one of Appellant's twenty-six challenges.

### A. Voir Dire

"[V]oir dire should be used to obtain information for the intelligent exercise of challenges." Rule for Courts-Martial (R.C.M.) 912(d) Discussion, *quoted in United States v. Bodoh*, 78 M.J. 231, 237 (C.A.A.F. 2019). "It is, however, subject to limitations." *Bodoh*, 78 M.J. at 237. We review a military judge's limitations on voir dire for a clear abuse of discretion. *United States v. Williams*, 44 M.J. 482, 485 (C.A.A.F. 1996).

This Court has recognized that generally "hypothetical questions provide a permissible means of exploring potential grounds for challenge." *United States v. Nieto*, 66 M.J. 146, 149 (C.A.A.F. 2008). However, "neither side is entitled to a commitment during *voir dire* about what [the members] will ultimately do" with respect to the sentence. *United States v.*

*Rolle*, 53 M.J. 187, 191 (C.A.A.F. 2000) (internal quotation marks omitted) (citation omitted).

Appellant complains that the military judge restricted his voir dire such that he could not fairly test members of the venire to determine whether they would fairly consider matters in extenuation and mitigation. He specifically objects to the refusal of the military judge to permit him to ask Command Sergeant Major (CSM) Lincoln, CSM Kirkover, and Sergeant Major (SGM) Delgado certain hypothetical questions.

The military judge gave both parties considerable latitude in questioning the members. He was concerned, however, with defense attempts to get court members to express opinions as to whether the death penalty would be appropriate by referencing aggravating factors without reference to mitigation and extenuation.

The military judge permitted the defense to ask abstract questions to draw out the members' views of the death penalty. He refused, however, to allow the defense to ask a hypothetical that he concluded was misleading and confusing:

> If you find someone guilty unanimously, of the premeditated murder of a mother and two little girls, or at least two little girls, if there is no issue of self-defense or defense of others, if there is no insanity or intoxication, there are no mental issues, it was not an accident, and the victims were completely innocent—now tell me about your views on the death penalty, or words to that effect

The military judge did not prevent the defense from asking, whether, if the court found Appellant guilty of the murder of a woman and her two children, they would automatically sentence him to death. He permitted a scope of voir dire broad enough for Appellant to challenge members who would "not be able impartially to follow the court's instructions and evaluate the evidence" and "to ascertain whether [the] prospective" panel members would impose the death penalty regardless of the facts and circumstances of the conviction. *Morgan v. Illinois*, 504 U.S. 719, 730, 735–36 (1992).

The issue is moot as to CSM Lincoln. Appellant challenged him for cause and he did not sit on Appellant's court-martial. A review of the voir dire shows that the members, including

CSM Kirkover and SGM Delgado agreed to follow the military judge's instructions; promised they would consider all of the evidence, including evidence in extenuation and mitigation; and insisted that they would not automatically adjudge the death penalty. The military judge did not abuse his discretion in limiting voir dire.

## B. Challenges for Cause

Appellant alleges that the military judge erred in denying challenges for cause for actual and implied bias against three court members: Lieutenant Colonel (LTC) Boyd, Major (MAJ) Weidlich, and LTC Watson. He contends that LTC Boyd and MAJ Weidlich could not be impartial in a case in which an accused was charged with premeditated murder of a child because they believed that death was the only appropriate punishment in such a case. Appellant argues that LTC Watson should have been excused because his experience as a police officer caused him to distrust defense counsel. "The burden of establishing that grounds for a challenge exist is upon the party making the challenge." R.C.M. 912(f)(3).

Courts generally recognize two forms of bias that subject a juror to a challenge for cause: actual bias and implied bias. *United States v. Wood*, 299 U.S. 123, 133 (1936). Actual bias is defined as "bias in fact." *Id.* It is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007) (internal quotation marks omitted) (citation omitted). "Actual bias is personal bias which will not yield to the military judge's instructions and the evidence presented at trial." *United States v. Nash*, 71 M.J. 83, 88 (C.A.A.F. 2012).

Whether a prospective juror "is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the [prospective juror's] state of mind." *Wainwright v. Witt*, 469 U.S. 412, 428 (1985). "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id.* It is "plainly [a question] of historical fact; did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v.*

*Yount*, 467 U.S. 1025, 1036 (1984). "As [the Supreme Court has] said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.' " *Id.* at 1038 (citation omitted); *see United States v. Dockery*, 76 M.J. 91, 96 (C.A.A.F. 2017) (granting great deference to the military judge's ruling on challenges for cause). Although this Court has recognized that "the legal question of actual bias … approximat[es] a factual question," we review actual bias claims for an abuse of discretion. *Nash*, 71 M.J. at 88–89.

Implied bias, on the other hand, is "bias conclusively presumed as [a] matter of law." *Wood*, 299 U.S. at 133. It is "bias attributable in law to the prospective juror regardless of actual partiality." *Id.* at 134 (emphasis added); *see Black's Law Dictionary, supra* p. 3, at 198 ("Bias, as of a juror, that the law conclusively presumes because of kinship or some other incurably close relationship; prejudice that is inferred from the experiences or relationships of a … juror ….").

This Court has taken a broader view of implied bias based on our interpretation of R.C.M. 912(f)(1)(N), which provides that "[a] member shall be excused for cause whenever it appears that the member … (N) Should not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." *See United States v. Woods*, 74 M.J. 238, 243 (C.A.A.F. 2015).

> The question before us, therefore, is whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high. To answer this question, we review the totality of the circumstances, and assume the public to be familiar with the unique structure of the military justice system.

*Id.* at 243–44 (internal quotation marks omitted) (citation omitted). We review "implied bias challenges pursuant to a standard that is less deferential than abuse of discretion, but more deferential than de novo review." *Dockery*, 76 M.J. at 96 (internal quotation marks omitted) (citation omitted).

Appellant's challenges against LTC Boyd, MAJ Weidlich, and LTC Watson alleged that these members were prejudiced against some person or relevant subject. For LTC Boyd and

MAJ Weidlich, it was a relevant subject: whether they would consider any sentence other than death for the premeditated murder of a mother and her two children. For LTC Watson, it was a person: whether he, as a former police officer who expressed distrust for some defense counsel, would fairly consider the arguments of Appellant's counsel.

Holding an inelastic attitude toward the appropriate punishment to adjudge if the accused is convicted is grounds for an actual bias challenge under R.C.M. 912(f)(1)(N). *United States v. Giles*, 48 M.J. 60, 62–63 (C.A.A.F. 1998). "However, a mere predisposition to adjudge some punishment upon conviction is not, standing alone, sufficient to disqualify a member. Rather, the test is whether the member's attitude is of such a nature that he will not yield to the evidence presented and the judge's instructions." *United States v. McGowan*, 7 M.J. 205, 206 (C.M.A. 1979); *accord United States v. James*, 61 M.J. 132, 138 (C.A.A.F. 2005).

During general voir dire, the defense asked if the members agreed with the statement that "life in prison is not really punishment for premeditated murder of children?" LTC Boyd and MAJ Weidlich both answered in the affirmative.

### 1. LTC Boyd

During individual voir dire, the trial counsel asked LTC Boyd whether he could fairly and fully consider both sentencing options if Appellant were convicted—confinement for life or death. LTC Boyd answered that he could. He also expressed an understanding that he could not decide what sentence was appropriate until he had heard all the evidence, including mitigation and extenuation. The military judge asked if LTC Boyd would "automatically have to vote for the death penalty if you were to sit on a panel where two little girls were the victims of premeditated murder?" LTC Boyd responded:

> Sir, let me clarify. My initial—the emotional portion within me as a father, I initially said life wouldn't be appropriate. Now, as I sat here and I was thinking about it, I had also indicated that to take someone's life as a result of premeditation in the murder would free them from having to be reminded of it for the rest of their lives. So, simply what I am saying, sir, is that I would be open-

minded. I know what my views are, but I would be
open-minded to listen to other panelists.

The military judge asked if LTC Boyd could "consider and
envision that life might be appropriate depending on what-
ever the evidence is that comes out?'" LTC Boyd answered
that he could.

The military judge concluded that LTC Boyd was:

> clearly willing to give his decisions a lot of thought.
> He does not have a kneejerk reaction to impose a
> certain sentence. Lieutenant Colonel Boyd made it
> clear, in an extremely credible manner, that he is
> willing to listen to all of the evidence and will
> consider the full range of punishments.
>
> … Lieutenant Colonel Boyd is not unalterably in
> favor of imposing the death penalty.
>
> Viewing all of [LTC] Boyd's responses as a whole,
> a reasonable person would not conclude that he is
> biased under the implied bias standard. The liberal
> grant standard does not warrant granting the
> challenge; therefore, the challenge for cause is
> denied.

We conclude that the military judge's findings of fact with
respect to LTC Boyd are not clearly erroneous. The military
judge did not abuse his discretion in denying the challenge for
actual bias, and LTC Boyd's inclusion would not have caused
the public to perceive Appellant's panel as less than fair and
impartial.

### 2. MAJ Weidlich

When specifically asked about his view of the death pen-
alty, MAJ Weidlich, a psychiatric nurse practitioner, said it
was "a viable option for anyone who's committed and found
guilty of an egregious crime."

> And I think it would be a little more difficult for
> me to, you know, being the father of four small
> children under the age of 10—to have their lives cut
> short, I that that would—it would be hard. I mean, I
> could be fair and objective; but I think that it would
> be something that I would consider.

The trial counsel asked if there was any crime, including the premeditated murder of children for which he would "automatically vote for the death penalty with no other considerations?" He answered:

> Automatically with no other considerations? You know, I would have to hear the evidence and hear what the circumstances were. You know, I understand in our nation we have the option of life in prison or the death penalty, but I think the decision on that would have to be made based on all of the evidence at hand. Again, now I think it is a viable option; but it would be dependent on, you know, what the circumstances were—intent, and premeditation and those sorts of things.
>
> … So I try to be very objective and very fair and open about those sorts of things. But I can't think of absolutely automatically death penalty, I would have to hear all of the evidence.

MAJ Weidlich indicated that, in determining whether the death penalty would be appropriate, he would consider factors such as premeditation and the evidence presented. "I don't think[, however,] that the murder of children automatically would make it a death-penalty offense, but it would definitely sway me to consider it more." In determining whether the death sentence should be imposed, MAJ Weidlich stated that remorse would be an important consideration. He would also consider the person's background. But he did not think the background would sway him "one way or another towards or against the death penalty. But again, it would really depend in my mind what background information is presented."

The military judge found Major Weidlich credible and that he would apply the presumption of innocence.

> While he believes the death penalty is an option for an egregious crime, and the decision becomes more difficult when children are the victims, he is clearly willing to hear all of the evidence, to include the background of the accused, before making a decision. He could not think of a case in which he would automatically impose the death penalty.
>
> ….
>
> In light of all of his answers, it is clear that Major Weidlich has not made up his mind as to an

> appropriate sentence. And, based on all of his responses, a reasonable person would not conclude that he is biased.
>
> The liberal grant mandate does not warrant a challenge for cause and, therefore the challenge for cause is denied.

We conclude that the military judge's findings of fact with respect to MAJ Weidlich are not clearly erroneous. The military judge did not abuse his discretion in denying the challenge for actual bias, and MAJ Weidlich's inclusion would not have caused the public to perceive Appellant's panel as less than fair and impartial.

### 3. LTC Watson

LTC Watson was a city police officer between 1999 and 2003, when he was recalled to active duty. His sister was a civilian prosecutor but had returned to law school to become a law librarian.

During his time as a police officer, LTC Watson came in contact with defense attorneys and his impression was "some good, some not so good." When asked about his not so good impressions, he stated: "When I was an arresting officer and I was the one that was sitting on the stand, the defense—mainly on DUI cases—just the way the defense handled officers as witnesses." He did not like:

> the line of questioning or the inferences that they were making toward the officer…. So, as somebody that was trained by the state on DUI detection, there was a lot of questions that were brought up about my expertise as somebody that can make decisions on DUI detection. So it would bring a lot of doubt into the jury on my abilities as an officer and other officers, the same thing.

He did not mind the questions themselves, but "just the way it was shaped with the jury and what was not allowed as evidence was some of the things that didn't sit well with me at that time."

Defense counsel asked whether testimony of police officers "bring with it a degree of credibility just as a baseline that's a little above what another witness might bring?" LTC Watson

answered: "It just depends on how they're presenting the evidence and their level of training. To a certain degree, yes." When asked a hypothetical about whether the death penalty would be the only appropriate penalty for the premeditated killing of a mother and two young children, LTC Watson answered: "I don't know that it's the only appropriate penalty. It could go either way, and it just depends on the amount of evidence that I've seen and the testimony that I've heard." He admitted that if there was also a sexual assault that "might shape [his] decision more towards the death penalty possibly. It doesn't mean that it would."

After the defense counsel finished asking LTC Watson questions, the military judge re-engaged, asking whether LTC Watson would give more or less weight to the testimony of a witness "solely because of that witness's position or status in life." LTC Watson answered:

> Not necessarily.
>
> ….
>
> I guess when anybody gives testimony, you have— you take what they're saying and they either become a credible witness or not so credible witness based on how they're presenting the evidence and based on how they're handling the questions. So I wouldn't, necessarily, you know, automatically find somebody credible just because they were a police officer?

The defense challenged LTC Watson on the ground that the performance of the law enforcement agencies in identifying, preserving, and testing of evidence would be critical to the case, and LTC Watson had an understanding and training in these matters that laypersons did not. The defense claimed that LTC Watson "would be going back into that deliberation with an aura of expertise that no other panel member would have because he would be able to speak with authority about collecting evidence at a crime scene and what is the proper procedure because he did so." And:

> he had some negative comments about defense attorneys, specifically the way defense attorneys approached law enforcement witnesses on the stand and that when defense attorneys would ask questions that he viewed unfair, based upon his prior knowledge of the case, he held that against

defense attorneys, specifically about evidence that may have not—would be suppressed or otherwise not a part of the case, that he viewed that it would be on.

The military judge denied the challenge against LTC Watson:

> Status by itself is not a basis for a challenge for cause. CAAF made it clear that the Army, through its regulations, may not exclude certain groups of Soldiers from being eligible to be detailed as court members; *see Bartlett*, 66 M.J. 426. Therefore, a current or former police officer is not *per se* a basis to challenge a member for cause.

> Lieutenant Colonel Watson's training years ago, which he had not used and has not be refreshed, does not provide a basis for a challenge for cause.

> He is not an expert in crime scene processing.

> ….

> Lieutenant Colonel Watson may have thought that some defense counsel were good and some were not so good. There is absolutely no evidence he harbors any ill feelings against defense counsel as a whole and absolutely no evidence that he harbors any ill feelings against defense counsel in this case.

> Lieutenant Colonel Watson made it very clear he wants to hear all of the evidence before he makes any decision in this case on findings and sentencing, if we get to sentencing.

> Lieutenant Colonel Watson was very candid and credible with his responses.

> The court has considered the implied bias and, based on Lieutenant Colonel Watson's demeanor in court and his responses, no reasonable person could conclude that he is biased against any party in this case. The court has considered the liberal grant mandate. This is not a close call; and, even under that mandate, there is not a basis for a challenge for cause. Accordingly, the challenge for cause against Lieutenant Colonel Watson is denied.

We conclude that the military judge's findings of fact with respect to LTC Watson are not clearly erroneous. The military judge did not abuse his discretion in denying the challenge for actual bias, and LTC Watson's inclusion would not have

caused the public to perceive Appellant's panel as less than fair and impartial.

## Judgment

This Court has carefully considered all issues in this case, including those we did not hear at oral argument, and none of them provides a basis for relief. The judgment of the United States Army Court of Criminal Appeals is affirmed.